**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
WESTERN DIVISION**

| | | |
|---|---|---|
| STATE OF NORTH DAKOTA, | ) | |
| STATE OF IDAHO, and | ) | |
| STATE OF MONTANA, | ) | |
| | ) | |
| Plaintiffs, | ) | Civil No. _____ |
| | ) | |
| v. | ) | |
| | ) | |
| THE UNITED STATES DEPARTMENT OF | ) | |
| INTERIOR; | ) | |
| DEBRA ANN HAALAND, in her official | ) | |
| capacity as Secretary of Interior; | ) | |
| THE BUREAU OF LAND MANAGEMENT; | ) | |
| and | ) | |
| TRACY STONE MANNING, in her official | ) | |
| capacity as the Director of the Bureau of Land | ) | |
| Management, | ) | |
| | ) | |
| Defendants. | ) | |

---

**COMPLAINT FOR REVIEW OF FINAL AGENCY ACTION**

---

The States of North Dakota, Idaho, and Montana ("Plaintiff States") hereby petition the

Court for review of a final rule promulgated by the United States Department of Interior through

the Bureau of Land Management ("BLM" or "Agency"), entitled "Conservation and Landscape

Health." 89 Fed. Reg. 40,308 (May 9, 2024) ("Final Rule"). A copy of the Final Rule is included

with this Complaint as **Attachment A**.

**INTRODUCTION**

1.      This Final Rule is part of BLM's broader initiative to use statutory authority given

to the Agency for facilitating the *development* of public resources into a policy of *obstructing* and

*preventing* the development of those resources for climate change reasons. Through other recently

promulgated rules and unilateral actions (some of which have already been enjoined by this Court and others), BLM has been evading its statutory duties to conduct quarterly lease sales of mineral rights, expanding its jurisdiction over State and private mineral interests, and unlawfully imposing greenhouse gas restrictions.  Now, through this particular Final Rule, BLM is formally attempting to convert the *non-use* of public resources into a permitted "use" of those resources.

2.     This Final Rule was promulgated as part of BLM's self-proclaimed "imperative" to protect public lands from "experienc[ing] adverse impacts from climate change."  89 Fed. Reg. 40,308.  To do so, the Final Rule makes the radical leap of establishing "conservation" as a "use" that is "on par with other uses of the public lands under FLPMA's multiple-use" framework.  *Id.* Changing non-use to a "use" is not some mere "clarification."  *Contra. id*.  This is perhaps the most fundamental change to how the federal government has managed federal resources since enactment of the Federal Land Policy and Management Act of 1976 (FLPMA), and it is being done as an act of agency rulemaking without any material change in statutory authorities.

3.     BLM is not the National Park Service and lacks statutory authority to pretend that it is.  Nor does BLM have a statutory mandate to overhaul the development of federal lands and resources due to the current Administration's climate change goals.  BLM's brazenness in promulgating this Final Rule is made even more remarkable by the fact that Congress and the President already rejected a substantially similar version of this Rule under the Congressional Review Act, rendering BLM's promulgation of this Final Rule unlawful twice over.  *See* Public Law No. 115-112, 131 Stat. 76 (Mar. 27, 2017) (rejecting the 2016 variation of this Rule); 5 U.S.C. § 801(b)(2) (a rejected rule "may not be reissued in substantially the same form … unless the reissued or new rule is specifically authorized by a law enacted after the date" of the rejected rule).

4.      BLM's attempt to use this Final Rule to unlawfully evade its statutory duties and advance ideologically driven environmental policies is unfortunate but not surprising.  Like many other federal agencies, BLM has been heeding the call of Executive Order 14008, entitled *Tackling the Climate Crisis at Home and Abroad*, 86 Fed. Reg. 7619 (Jan. 27, 2021).  For BLM, heeding the call of EO14008 led the Agency to unlawfully cancel statutorily mandated quarterly lease sales across the country under the guise of protecting the climate.  That effort was quickly rebuffed by multiple Federal Court decisions holding that BLM was violating its non-discretionary obligations under Mineral Leasing Act of 1920 ("MLA"), 30 U.S.C. §§ 181 *et seq.  See State of North Dakota v. U.S. Dept. of Interior,* No. 1:21-cv-00148, ECF 98 (D.N.D. Mar. 27, 2023); *see also Louisiana et al. v. Biden et al.*, 622 F.Supp.3d 267 (W.D. La. Aug. 18, 2022).

5.      As with its failure to execute non-discretionary leasing activities, BLM's asserted "conservation" goals in this Final Rule come not from the statutory authorities granted to BLM in the MLA or FLPMA, but instead from the policy goals of Executive Order 14008.  89 Fed. Reg. 40,308, 40,311.  However, Executive Order policy goals cannot override statutory duties, and EO 14008 cannot be used to transform the *non-use* of public lands and resources into one of the "uses" mandated under FLPMA.  *See* 43 U.S.C. § 1702(c), (l).

6.      Recent events have seen federal agency after federal agency contort their rulemaking authorities to promulgate climate-related rules without statutory mooring, forcing States to challenge these rules time and time again.  *See, e.g., Kentucky v. Fed. Highway Admin.*, ---F.Supp.3d---, 2024 WL 1402443 (W.D. Ky. Apr. 1, 2024) (invalidating Department of Transportation climate rule purporting to mandate States set declining on-road $CO_2$ emission targets for lacking any statutory basis and being arbitrary and capricious); *Iowa v. Sec. and Exchange Comm'n*, No. 24-1522, Entry 537990 (8th Cir. Apr. 3, 2024) (challenging SEC rule

requiring public companies to make climate-related disclosures as lacking any statutory basis); *Louisiana v. Biden*, No. 2:24-cv-406, Dkt. 1 (W.D. La. Mar. 21, 2024) (challenging Department of Energy's unilateral "pause" on liquified natural gas exports for climate-related reasons as clearly contrary to statute). And, unfortunately, BLM has proven itself to be one of the worst offenders. *See North Dakota v. Dep't of Interior*, No. 1:21-cv-00148, Dkt. 98 (D.N.D. Mar. 27, 2023) (enjoining BLM's refusal to hold statutorily mandated oil and gas lease sales for climate-related reasons); *see also North Dakota et al. v. Dep't of Interior*, No. 1:24-cv-00066 (D.N.D.) (challenging BLM's use of statutory authority designed for preventing the waste of federal resources to enact climate change policies).

7.      This Final Rule is more of the same: it is the product of a federal agency rewriting the statutory multiple *use* framework provided by FLPMA for the management of public resources in order to make *non-use* of those resources a "use" for putative climate change reasons.

8.      Moreover, to put icing on the cake, BLM pushed through this Final Rule without formally considering the major environmental consequences it will have as is required under the National Environmental Policy Act ("NEPA"). And BLM's Economic and Threshold Analysis also entirely fails to quantify any costs of the Final Rule, including the significant cost the Final Rule will impose on Plaintiff States in lost royalties and revenues from blocked mineral development and other FLPMA-recognized uses of BLM lands. For these and many other reasons, the Final Rule should be vacated.

## JURISDICTION AND VENUE

9.      The Court has jurisdiction over this Complaint under 28 U.S.C. § 1331 because the claims presented arise under federal law, and under 5 U.S.C. §§ 702 and 706 which waive the United States's sovereign immunity.

10.     Venue is proper in this Court under 28 U.S.C. § 1391(e) because Plaintiff State of North Dakota resides within the District of North Dakota and because property subject to the action is situated in the District of North Dakota.

## PARTIES

11.     Plaintiff State of North Dakota is a sovereign State of the United States of America and acts pursuant to its State Constitution and laws on behalf of its citizens to manage the development of natural resources in the State, including oil and gas exploration and production. North Dakota obtains a large share of its tax revenue directly and indirectly from oil and gas development and also receives royalties from the development of State-owned minerals.  Drew Wrigley is the Attorney General of North Dakota and is authorized to "[i]nstitute and prosecute all actions and proceedings in favor or for the use of the state."  N.D.C.C. § 54-12-01(2).

12.     Plaintiff State of Idaho is a sovereign State of the United States of America and acts pursuant to its State Constitution and laws on behalf of its citizens to manage the development, use, and conservation of natural resources in Idaho, including its rangelands, forests, waters, wildlife, minerals, and energy resources.  Idaho obtains a large share of its tax revenue from livestock grazing and mining on BLM lands and also receives royalties from the development of State-owned resources on State-owned endowment lands adjacent to BLM lands. Raúl R. Labrador is the Attorney General of Idaho and authorized "[t]o perform all legal services for the state and to represent the state and all departments, agencies, offices, officers, boards, commissions, institutions and other state entities in all courts and before all administrative tribunals or bodies of any nature."  Idaho Code § 67-1401(1) (as amended by 2024 Idaho Sess. Laws Ch. 194).

13.     Plaintiff State of Montana is a sovereign State of the United States of America and acts pursuant to its State Constitution and laws on behalf of its citizens to manage the development

of natural resources in the State, including oil and gas exploration and production.  Montana obtains a large share of its tax revenue directly and indirectly from oil and gas development and also receives royalties from the development of State-owned minerals.  Montana brings this suit through its Attorney General, Austin Knudsen, who is the chief legal officer of the State of Montana and has the authority to represent the State in federal court.  Mont. Const. art. VI, § 4(4); Mont. Code Ann. § 2-15-501(1).

14.     Defendant United States Department of Interior is an Executive Branch agency that administers land and mineral estates owned by the Federal Government in Plaintiff States, and in North Dakota specifically.

15.     Defendant Secretary Debra Haaland is Secretary of the United States Department of the Interior and is sued in her official capacity.

16.     Defendant BLM is a sub-component of the United States Department of the Interior.  BLM is the custodian of the federal mineral estate and is responsible for the administration and management of oil and gas development on federal lands.

17.     Defendant Tracy Stone Manning is Director of the Bureau of Land Management and is sued in her official capacity.

## FEDERAL STATUTORY FRAMEWORK

### A.     The Federal Land Policy and Management Act

18.     BLM's management of public lands is governed by the Federal Land Policy and Management Act of 1976 ("FLPMA"), 43 U.S.C. § 1701 *et seq*.  "At its core, FLPMA is a land use planning statute." *Wyoming, et al. v. U.S. Dep't of Interior*, 493 F.Supp.3d 1046, 1063 n.16 (D. Wyo. 2020); *see also* 43 U.S.C. § 1712(a) ("The Secretary shall, with public involvement and

consistent with the terms and conditions of this Act, develop, maintain, and, when appropriate, revise land use plans…").

19.     FLPMA "established a policy in favor of retaining public lands for multiple use management." *Lujan v. National Wildlife Federation*, 497 U.S. 871, 877 (1990). "Multiple use management" describes the task of striking a balance among the many competing uses to which land can be put, "including, but not limited to, recreation, range, timber, minerals, watershed, wildlife and fish, and [uses serving] natural scenic, scientific and historical values." *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 58 (2004) (quoting 43 U.S.C. § 1702(c)).

20.     "A second management goal, 'sustained yield,' requires BLM to control depleting uses over time, so as to ensure a high level of valuable uses in the future." *Id.* (quoting 43 U.S.C. § 1702(h)).  "To these ends, FLPMA establishes a dual regime of inventory and planning … provid[ing] for a comprehensive, ongoing inventory of federal lands, and for a land use planning process that 'project[s]' 'present and future use.'" *Id.* (quoting 43 U.S.C. § § 1701(a)).

21.     Under these mandates, "FLPMA identifies 'mineral exploration and production' as one of the 'principal or major uses' of public lands." *WildEarth Guardians v. Bernhardt*, 502 F. Supp. 3d 237, 241 (D.D.C. 2020) (citing 43 U.S.C. § 1702(l) ("The term 'principal or major uses' includes, *and is limited to*, [1] domestic livestock grazing, [2] fish and wildlife development and utilization, [3] mineral exploration and production, [4] rights-of-way, [5] outdoor recreation, and [6] timber production.") (emphasis and bracketed numbers added)).

22.     FLPMA also imposes detailed procedural requirements on any substantial change in land management policy.  *See, e.g.,* 43 U.S.C. §§ 1739(e); 1712(f); & 1714(h).  This includes express limitations on the authority of the Secretary to withdraw lands from development.  43

U.S.C. § 1714(a) ("[T]he Secretary is authorized to make, modify, extend, or revoke withdrawals but *only in accordance with the provisions and limitations of this section*.") (emphasis added).

23.     In developing land use plans, FLPMA directs that the Secretary shall "coordinate" with the States, "assure that consideration is given" to the States' land-use plans, and "provide for meaningful public involvement of State and local government officials, both elected and appointed, in the development of land use programs, land use regulations, and land use decisions for public lands." 43 U.S.C. § 1712(c)(9); *see also id*. § 1752(d) (stating that in developing grazing allotment management plans, BLM "shall do so in careful and considered consultation, cooperation and coordination with … any State or States having lands within the area to be covered by such allotment management plan.").

**B.    The Mineral Leasing Act**

24.     The MLA, 30 U.S.C. § 180 *et seq*., created a program for leasing mineral deposits on federally owned lands. The purpose of MLA is to "promote the orderly development of oil and gas deposits in publicly owned lands of the United States through private enterprise, and to obtain for the public reasonable financial returns on assets belonging to the public." *Wyoming*, 493 F. Supp. 3d at 1062 (internal citations omitted); *see also Arkla Exploration Co. v. Texas Oil & Gas Corp.*, 734 F.2d 347, 358 (8th Cir. 1984) ("The broad purpose of the MLA was to provide incentives to explore new, unproven oil and gas areas through noncompetitive leasing, while assuring through competitive bidding adequate compensation to the government for leasing in producing areas.").

25.     To avoid waste and protect correlative rights, the MLA authorizes federal, state, and private owners to enter into cooperative management units, known as "communitization agreements," governing the efficient development mineral interests through pooling. *See* 30

U.S.C. § 226(m) ("For the purpose of more properly conserving the natural resources of any oil or gas pool … lessees thereof and their representatives may unite with each other … in collectively adopting and operating under a cooperative or unit plan of development.").

26.    Importantly, this authority is limited and requires the "consent of the holders of leases involved." *Id.* Further, the MLA's authority to enter communitization agreements explicitly recognizes that States continue to retain their sovereign rights for managing the development of non-federal minerals. *See* 30 U.S.C. § 189 ("[n]othing in this chapter shall be construed or held to affect the rights of the States or other local authority to exercise any rights which they may have"); *see also* 30 U.S.C. § 187 (no leases issued by the Secretary of the Interior "shall be in conflict with the laws of the State in which the leased property is situated").

**C.  The Three Phases of Federal Oil and Gas Development Under FLPMA and the MLA**

27.    BLM manages the use of federal oil and gas resources through a three-phase decision-making process under FLPMA and the MLA. First, BLM establishes a resource management plan ("RMP") for "tracts or areas," 43 U.S.C. § 1712(a), which in some instances can encompass an entire State.  Second, BLM conducts lease sales under the MLA.  And third, BLM considers applications for permission to drill.

28.     Under the first phase, the Secretary is required to "develop, maintain, and, when appropriate, revise [RMPs] which provide *by tracts or areas* for the use of public lands." 43 U.S.C. § 1712(a) (emphasis added).  During this first phase of land use planning, a BLM field office develops a RMP (or multiple RMPs) for its assigned geographic area (the "planning area").  43 U.S.C. § 1712(a); 43 C.F.R. §§ 1601.0-5(n), 1610.1.

29.    A RMP is a public and binding document issued through the public notice and comment process.  *See* 43 CFR § 1601.0-5(k).  "All future resource management authorizations

9

and actions, as well as budget or other action proposals to higher levels in the Bureau of Land Management and Department, and subsequent more detailed or specific planning, shall conform to the approved plan." 43 C.F.R. §§ 1610.5-3(a). "The resource management plans establish which areas within the Field Office's boundaries are open to oil and gas leasing and which areas are closed." *W. Energy All. v. Jewell*, 2017 WL 3600740, at *2 (D.N.M. Jan. 13, 2017).

30.     Unless and until amended through a formal planning process, the resource management plan is binding on the BLM. *See Norton*, 542 U.S. at 69 ("The statutory directive that BLM manage 'in accordance with' land use plans, and the regulatory requirement that authorizations and actions 'conform to' those plans, prevent BLM from taking actions inconsistent with the provisions of a land use plan.").

31.     The second phase of federal oil and gas management—the leasing phase—is where Federal Defendants conduct the required quarterly sales to lease lands that have been declared open to mineral leasing under the relevant regional RMP. The MLA mandates that oil and gas "[l]ease sales **shall** be held for each State where eligible lands are available **at least quarterly** and more frequently if the Secretary of the Interior determines such sales are necessary." 30 U.S.C. § 226(b)(1)(A) (emphasis added).

32.     This duty to conduct quarterly lease sales is not permissive or discretionary. *See State of North Dakota*, No. 1:21-cv-00148, ECF 98 at ¶ 86 (D.N.D. Mar. 27, 2023) ("Neither the Secretary nor BLM have 'discretion' to postpone a quarterly lease sale"); *W. Energy All. v. Jewell*, 2017 WL 3600740, at *7 (D.N.M. Jan. 13, 2017) ("BLM is under no such discretion and 'shall' hold lease sales for each state where eligible parcels are available at least quarterly."); *State of Louisiana et al. v. Joseph R. Biden, Jr. et al.*, No. 2:21−CV−00778, ECF No. 139 at 33 (W.D. La. Mar. 24, 2021) (The "MLA requires the [Federal Defendants] to hold lease sales, where eligible

lands are available at least quarterly."); *S. Utah Wilderness All. v. Bernhardt,* 512 F.Supp.3d 13, 17 (D.D.C. 2021) ("If a [RMP] authorizes oil and gas development on certain land parcels, BLM must sell leases for those parcels on a quarterly basis.") (citing 30 U.S.C. § 226(b)(1)(A)).

33.     The third and final phase of federal oil and gas management—the development phase—is where a successful lease bidder applies to BLM for permits to conduct drilling operations.  Once issued, an oil and gas lease confers "the right to use so much of the leased lands as is necessary to explore for, drill for, mine, extract, remove and dispose of all the leased resource in a leasehold."  43 C.F.R. § 3101.1-2.

34.     It is through this Federal statutory and regulatory framework that BLM has worked in partnership with the States to develop public resources for decades.

### D.  The National Environmental Policy Act

35.     The National Environmental Policy Act of 1970, 42 U.S.C. § 4321 *et seq.*, imposes procedural requirements on federal agency rulemaking to "ensure[] that [an] agency, in reaching its decision … will carefully consider, detailed information concerning significant environmental impacts."  *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989).  NEPA "also guarantees that the relevant information will be made available to the larger audience that may also play a role in both the decisionmaking process and the implementation of that decision."  *Id.*

36.     NEPA requires federal agencies to "'include in every recommendation or report on ... major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official' evaluating the environmental impact of the proposal …most commonly referred to as an Environmental Impact Statement, or EIS."  *Pub. Emps. for Env't Resp. v. Nat'l Park Serv.*, 605 F. Supp. 3d 28, 55 (D.D.C. 2022) (quoting 42 U.S.C. § 4332(2)(C)).  "Sometimes, agencies may instead 'prepare a more limited document' known as an Environmental

Assessment (EA), if the agency's proposed action neither is categorically excluded from the requirement to produce an EIS nor would clearly require the production of an EIS." *Id.* (citing *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 757 (2004)).

37.     Under regulations promulgated by the Council on Environmental Quality, an agency can avoid preparing an EIS or an EA only when the the proposed action fits within a "categorical exclusion." *See* 40 C.F.R. § 1501.4(a).

38.     "Categorical exclusion means a category of actions that the agency has determined … normally do not have a significant effect on the human environment." 40 C.F.R. § 1508.1(d). Each agency can identify "categories of actions that normally do not have a significant effect on the human environment, and therefore do not require preparation of an environmental assessment or environmental impact statement." 40 C.F.R. § 1501.4(a).  But even "[i]f an agency determines that a categorical exclusion identified in its agency NEPA procedures covers a proposed action, the agency shall evaluate the action for extraordinary circumstances in which a normally excluded action may have a significant effect." 40 C.F.R. § 1501.4(b).

39.     Relevant to this dispute, BLM's categorical exclusion covers "[p]olicies, directives, regulations, and guidelines: that are of an administrative, financial, legal, technical, or procedural nature; or whose environmental effects are too broad, speculative, or conjectural to lend themselves to meaningful analysis and will later be subject to the NEPA process, either collectively or case-by-case." 43 C.F.R. § 46.210(i).

40.     Actions that fall with BLM's categorical exclusion do not require an Environmental Impact Statement "*unless* any of the extraordinary circumstances in section 46.215 apply." 43 C.F.R. § 46.210 (emphasis added). "Any action that is normally categorically excluded *must be evaluated* to determine whether it meets any of the extraordinary circumstances in section 46.215;

if it does, further analysis and environmental documents *must be prepared* for the action." 43 C.F.R. § 46.205(c)(1) (emphases added).

41.    And Section 46.215 lists twelve extraordinary circumstances that require an otherwise categorically excluded action to go through additional environmental analysis. 43 C.F.R. § 46.215. Those extraordinary circumstances exist when an action: (a) has "significant impacts on public health or safety;" (b) has "significant impacts on … natural resources and unique geographic characteristics;" (c) has "highly controversial environmental effects or involve unresolved conflicts concerning alternative uses of available resources;" (d) has "highly uncertain and potentially significant environmental effects or involve unique or unknown environmental risks;" (e) "establish[es] a precedent for future action or represent[s] a decision in principle about future actions with potentially significant environmental effects;" (f) has "a direct relationship to other actions with individually insignificant but cumulatively significant environmental effects;" (g) has "significant impacts on properties listed, or eligible for listing, on the National Register of Historic Places as determined by the bureau;" (h) has "significant impacts on species listed, or proposed to be listed, on the List of Endangered or Threatened Species or have significant impacts on designated Critical Habitat for these species;" (i) "[v]iolate[s] a federal law, or a State, local, or tribal law requirement imposed for the protection of the environment;" (j) has "a disproportionately high and adverse effect on low income or minority populations;" (k) "[l]imit[s] access to and ceremonial use of Indian sacred sites on Federal lands by Indian religious practitioners or significantly adversely affect[s] the physical integrity of such sacred sites;" or (l) "[c]ontribute[s] to the introduction, continued existence, or spread of noxious weeds or non-native invasive species known to occur in the area or action that may promote the introduction, growth, or expansion of the range of such species." *Id.*

### BLM'S MULTIPRONGED ASSAULT ON THE LEASING AND
### DEVELOPMENT OF NATURAL RESOURCES

**A.  BLM's Unlawful Cancellation of Quarterly Lease Sales**

42.    At the start of the current presidential administration, President Biden issued Executive Order 14008, which directed the Secretary of the Interior to "pause new oil and natural gas leases on public lands" "to the extent consistent with applicable law" pending a review of "Federal oil and gas permitting and leasing practices." 86 Fed. Reg. at 7624.  Pursuant to that Executive Order, the Secretary began cancelling statutorily mandated quarterly lease sales across the country in January of 2021 under the guise of protecting the climate.

43.    On March 24, 2021, thirteen states filed a complaint in the Western District of Louisiana seeking declaratory and injunctive relief.  The *Louisiana* court issued a permanent injunction prohibiting the Federal Defendants from implementing the "pause" contemplated in EO 14008 in the 13 plaintiff States, holding that "Section 208 of Executive Order 14008 is *ultra vires*, beyond the authority of the President of the United States, and in violation of the [] MLA" because "[e]ven the President cannot make significant changes to the [] MLA that Congress did not delegate." *Louisiana v. Biden,* 622 F.Supp.3d at 289–90.  As the court observed, a "command in an Executive Order does not exempt an agency from the [Administrative Procedure Act's ("APA's")] reasoned decision-making requirement." *Id.* at 294-295 (citing *California v. Bernhardt*, 472 F.Supp.3d 573, 600–01 (N.D. Cal. 2020)).

44.    On July 7, 2021, North Dakota filed suit challenging Federal Defendants' cancellation of quarterly lease sales in North Dakota.  *See State of North Dakota v. U.S. Dept. of Interior et al.,* No. 1:21-cv-00148 (D.N.D.).  And on March 27, 2023, this Court entered a preliminary injunction against the Federal Defendants, finding that the Federal Defendants had

failed to timely hold quarterly lease sales as statutorily required under the MLA. *See State of North Dakota,* No. 1:21-cv-00148, ECF 98 (Mar. 27, 2023).

45.     This Court held that "BLM's voluntarily choosing to redo NEPA analyses for parcels" did not justify a failure to hold Congressionally mandated quarterly leases sales under the MLA. *Id.* at ¶¶ 78-79.   Similarly, this Court held that that BLM's proffered excuse that it was "compiling nationwide GHG emissions during 2020 and estimates for 2021" might yield important information, but that its "importance cannot override the statutory command for (1) lands to be timely evaluated for potential leasing and (2) quarterly lease sales to occur when parcels meet the statutory requirements under" the MLA. *Id.*

46.     Both the *Louisiana* and *North Dakota* cases emphasize that BLM cannot justify non-compliance with statutory mandates based on an executive order's policy goals.   There was of course nothing revolutionary about that those holdings.   "In issuing directives to govern the Executive Branch, the President may not, as a general proposition, require or permit agencies to transgress boundaries set by Congress."  *EDF v. Thomas*, 627 F.Supp.566, 570 (D.D.C. 1986) (quoting U.S. Dep't of Justice, Office of Legal Counsel Opinion on EO 12291 (Feb. 13, 1981)).

**B.   BLM's Repeat Attempts to Unlawfully Regulate Greenhouse Gas Emissions**

47.     In addition to actively shirking its statutory duty to promote and facilitate the leasing of federal natural resources, BLM has also been engaged in on-and-off attempts to exceed its statutory authorities to impose greenhouse gas emission restrictions designed to curtail natural resource development, changing its position with each presidential administration.

48.     On April 10, 2024, BLM promulgated a Final Rule entitled "Waste Prevention, Production Subject to Royalties, and Resource Conservation."  89 Fed. Reg. 25,738.  That rule is an updated variant of a 2016 Rule (81 Fed. Reg 83,008) that was vacated after a federal court held BLM "exceeded its waste prevention authority in promulgating regulations primarily intended to

benefit the environment and improve air quality." *Wyoming*, 493 F. Supp. 3d at 1074.  But like

the last iteration of that Rule, BLM is once again attempting to use statutory authorities for

preventing the waste of federal resources to impose air emissions restrictions for putative climate

change reasons—restrictions designed to curtail federal oil and gas development on the back end

if the courts prevent the agency from avoiding its statutory obligations to issue mineral

development leases on the front end.

49.     On April 24, 2024, North Dakota and several other states brought litigation

challenging that BLM rule.  *See North Dakota et. al. v. U.S. Dep't of Interior*, No. 1:24-cv-00066

(D.N.D.).  That litigation is currently pending before this Court.

### CONGRESSIONAL REJECTION OF BLM'S 2.0 PLANNING RULE AND RE-PROMULGATION OF A SUBSTANTIALLY SIMILAR RULE

50.     This isn't BLM's first attempt to elevate non-use into a "use" for federal natural

resources.  In the twilight hours of the Obama Administration, BLM also promulgated a rule

restricting the development of public resources for putative climate change reasons.  *See* Resource

Management Planning, Final Rule, 81 Fed. Reg. 89,580 (Dec. 12, 2016) (frequently referred to as

BLM's "2.0 Planning Rule").

51.     On March 7, 2017, both houses of Congress passed a resolution under the

Congressional Review Act repealing BLM's 2.0 Planning Rule, which was signed by President

Trump on March 27, 2017.  *See* Public Law No. 115-112, 131 Stat. 76 (Mar. 27, 2017).

52.     Under the Congressional Review Act, a rejected rule "may not be reissued in

substantially the same form, and a new rule that is substantially the same … may not be issued,

unless the reissued or new rule is specifically authorized by a law enacted after the date" of the

rejected rulemaking. 5 U.S.C. § 801(b)(2).

53.     Nonetheless, without any relevant change in statutory authority, BLM proposed a rule that was substantially the same in purpose and effects. 88 Fed. Reg. 19,583 (April 3, 2023).

54.     To be sure, BLM changed some of the verbiage this time-around.  It also changed up some of the CFR sections being modified.   But fundamentally the Final Rule remains substantially the same as BLM's 2.0 Planning Rule in purpose and effects.

55.     For example, both adopt a "mitigation hierarchy" process designed to make the development of federal resources more difficult. *Compare* 81 Fed. Reg. 89,596, 89,662 (revising 43 C.F.R. § 1601.0-5) *with* 89 Fed. Reg. 40,346 (revising 43 C.F.R. § 6102.5.1).

56.     Both use similar descriptions for identifying "important" Areas of Critical Environmental Concern (ACEC) that will restrict resource development. *Compare* 81 Fed. Reg. at 89,670–89,671 ("*Importance*. The value, resource, system, process, or natural hazard … must have substantial significance and values. This generally requires qualities of special worth, consequence, meaning, distinctiveness, or cause for concern. A natural hazard can be important if it is a significant threat to human life or property.") *with* 89 Fed. Reg. at 40,338 ("A historic, cultural, or scenic value; a fish or wildlife resource; a natural system or process; or a natural hazard potentially impacting life and safety has importance if it has qualities of special worth, consequence, meaning, distinctiveness, or cause for concern … A natural hazard can be important if it is a significant threat to human life and safety.").

57.     And both apply landscape-style management approaches to resource management planning. *Compare* 81 Fed. Reg. 89,584 ("Multiple directives related to climate change also emphasize the importance of collaboration, science, adaptive management, and the need for landscape-scale approaches to resource management.") *with* 89 Fed. Reg. 40,346 (BLM will "[u]se

a landscape-scale approach to develop and implement mitigation strategies that identify mitigation needs and opportunities in a geographic area ….").

58.     In comments filed in opposition to the proposed rule, Plaintiff States (and many others) pointed out the proposed rule was substantially similar to the rejected 2016 rulemaking and consequently prohibited by the Congressional Review Act.  *E.g.,* **Attachment B**, Comments of North Dakota, BLM-2023-0001-153781 (July 5, 2023).

59.     BLM disregarded those comments, promulgating this Final Rule with only a single paragraph purporting to explain how this Final Rule was not substantially similar to BLM's 2.0 Planning Rule, claiming that "the present rule do[es] not amount to the same landscape-scale planning approach that was central to the 2016 rule."  89 Fed. Reg. at 40,314-15.

60.     But regardless of whether this Final Rule uses different terminology, it doesn't change the fact that this Final Rule remains substantially similar to BLM's 2.0 Planning Rule in both purpose and effect.

## THIS FINAL RULE

61.     This Final Rule, which BLM set to become effective on June 10, 2024, upends the longstanding leasing process for federal resources governed by the MLA and FLPMA.  It significantly changes how BLM administers its multiple use mandate under FLPMA, including how it prioritizes lands for development.

62.     The Final Rule elevates conservation (an express *non-use*) as a principal "use" alongside the uses that are expressly authorized under FLPMA.  This manifests itself in many forms, all of which exceed BLM's statutory authority.

63.     First, the Final Rule establishes "conservation" as "a land use within the multiple use framework, including in decision-making, authorization, and planning processes." Final Rule § 6101.5(d).  "Conservation" is defined as the "management of natural resources to promote

18

protection and restoration. Conservation actions are effective at building resilient lands and are designed to reach desired future conditions through protection, restoration, and other types of planning, permitting, and program decision-making."  Final Rule § 6101.4(b).

64. Second, the Final Rule expands the statutory definition of "sustained yield" under FLPMA by adding "ecosystem resilience" requirements that are absent from 43 U.S.C. § 1702(h). 89 Fed. Reg. 40,346-49.  This addition undermines FLPMA's requirement that "sustained yield" be achieved "consistent with multiple use.  *Compare* 43 U.S.C. § 1702(h) ("The term 'sustained yield' means the achievement and maintenance in perpetuity of a high-level annual or regular periodic output of the various renewable resources of the public lands consistent with multiple use") *with* Final Rule § 6101.4 ("'Sustained yield' means the achievement and maintenance in perpetuity of a high-level annual or regular periodic output of the various renewable resources of BLM-managed lands consistent with multiple use and without permanent impairment of the productivity of the land. Preventing permanent impairment means that renewable resources are not permanently depleted and that desired future conditions are met for future generations.").

65. Third, Final Rule Subparts 6102 (Conservation Use to Achieve Ecosystem Resilience) and Subparts 6103 (Managing Land Health to Achieve Ecosystem Resilience) further compound these errors by creating requirements for protection of "landscape intactness" (§ 6102.1; § 6102.2), creating "restoration and mitigation leases" (§ 6102.3; § 6102.3.1; § 6102.4; § 6102.4.1; § 6102.4.2), creating requirements for the management for "ecosystem resilience" (§ 6102.5), and creating "land health" standards (§ 6103.1; § 6103.1.1; § 6103.1.2)—all of which fail to consider the Congressionally-required multiple use and sustained yield requirements for balancing nonrenewable resource uses of lands.

66.     Of particular note, the Final Rule's creation of restoration and mitigation "leases" violates FLPMA in multiple respects.  For one, the Final Rule's creation of restoration and mitigation "leases" violates FLPMA's procedural requirements for withdrawing lands from development. Section 1714 of FLPMA places specific requirements on BLM before withdrawals can be made, including requiring that the Secretary publish notices of withdrawals in the Federal Register.  *See* 43 U.S.C. § 1714(b)(1).  The Final Rule does not account for any of those requirements before allowing restoration and mitigation leases to effectively withdraw public lands from development.  For another, the Final Rule's creation of restoration and mitigation "leases" violates FLPMA's requirement that BLM manage lands according to an approved RMP.  Once an RMP is promulgated, FLPMA prohibits the Secretary of the Interior from acting inconsistent with the RMP.  *See Norton*, 542 U.S. at 69; 43 U.S.C. § 1732(a) ("The Secretary shall manage the public lands … in accordance with the land use plans developed by him[.]"); 43 C.F.R. § 1610.5-3 ("All future resource management authorizations and actions … shall conform to the approved plan.").  BLM cannot deviate from an approved RMP without formally amending the RMP through notice and comment. 43 U.S.C. § 1712(f).

67.     As another issue, the Final Rule's new provisions expanding Areas of Critical Environmental Concern ("ACECs"), § 1610.7-2 (Designation of Areas of Critical Environmental Concern) explicitly incorporate and reference BLM's unlawful new elevation of "conservation" as a "use" under FLPMA, prioritizing conservation over the statutorily authorized principal or major uses.  *See* Final Rule § 1610.7-2(l) (incorporating "conservation" definition from § 6101.4).

68.     Finally, despite numerous comments putting BLM on notice that its proposed rule would have significant environmental repercussions requiring an Environmental Impact Statement under NEPA, BLM entirely skipped that step in promulgating the Final Rule.  The Final Rule

simply asserts that the "categorical exclusion applies because the rule sets out a framework but is not self-executing[,] … [it] is administrative or procedural in nature[,] … [and] the environmental affects … [are] too speculative or conjectural to meaningfully evaluate now." 89 Fed. Reg. at 40,333.  The Final Rule also states—without any analysis or explanation whatsoever—"that none of the extraordinary circumstances identified at 43 C.F.R. 46.215 applies to this rulemaking."  *Id.*

### INJURY TO PLAINTIFF STATES DUE TO THE FINAL RULE

69.     The MLA recognizes States' sovereign authority over their natural resources and directs that "[n]othing in this chapter shall be construed or held to affect the rights of the States or other local authority to exercise any rights which they may have."  30 U.S.C. § 189.

70.     FLPMA further recognizes that "the public lands be managed in a manner which recognizes the Nation's need for domestic sources of minerals, food, timber, and fiber from the public lands," 43 U.S.C. § 1701(a)(12), and that "[t]he policies of this Act shall … be construed as supplemental to and not in derogation of the purposes for which public lands are administered under other provisions of law," *id.* at § 1701(b).

71.     Plaintiff States are injured by the Final Rule in multiple ways.

72.     The Final Rule interferes with Plaintiff States' authority to regulate, manage, and develop their natural resources, including mineral interests owned by States and private parties. *See Solid Waste Agency of Northern Cook County v. United States Army Corps of Engineers*, 531 U.S. 159, 174 (2001) ("States have a constitutional right to maintain their "traditional and primary power over land and water use.")

73.     The Final Rule will restrict oil and gas development in Plaintiff States, particularly in States that manage oil and gas development through regulatory structures that involve the pooling (or "communitization") of mineral interests with any quantum of federal mineral interests.

21

74.     In North Dakota, for example, mineral interest communitization agreements frequently include federal interests intermingled with State-owned and privately-owned interests in spacing units that are arrayed across the State in a checkerboard manner.[1]   BLM manages approximately 4 million acres of mineral interests in North Dakota, and Federal mineral interests are present in over 30% of the spacing units in North Dakota.  Virtually all federal oil and gas interests in North Dakota are pooled with State or private interests to some extent.

75.     Similarly, in Montana, the surface and mineral estates are intermingled between fee, State, and federal ownership, and BLM and the State are large land and mineral owners. Among federal, State, and private ownership of the surface and mineral estates there are many combinations of ownership, creating a checkerboard of lands with private or state surface ownership overlaying a mix of federal, state, and private mineral ownership.  Montana law establishes rules by which the various mineral interests in certain locations enter into "pooling agreements" to share both the costs and benefits of developing the pooled or unitized mineral interests.  *E.g.*, Mont. Code. Ann. § 82-11-202

76.     The Final Rule's creation of mitigation and restoration "leases" on sparse federal mineral interests will thereby unlawfully block the development of surrounding State and private mineral interests that are subject to communitization or pooling agreements.  For example, if BLM leases the 1% federal interest in a communitized area for an unlawful "conservation" lease, it will

---

[1] The reason for the checkerboard nature of federal mineral interests in North Dakota is historical in origin.  Unlike many western states, more than 97% of the surface and mineral estates in North Dakota were privately or State owned as a result of the homestead and railroad acts in in the late 1800s.  However, during the depression of the 1930s, many small privately-owned tracts went through foreclosure and were acquired by the federal government through the Federal Land Bank and Bankhead Jones Act. The federal government later sold many of those surface estates, but retained many of those small, scattered mineral estates—creating a checkerboard-like appearance of small pockets of federal mineral interests across the State.

block the other 99% of owners who may wish to develop their mineral interests (including Plaintiff States themselves as mineral interest owners).

77.     North Dakota collected $1,494,531,005 in oil and gas production taxes and $1,202,104,198 in oil and gas extraction taxes in 2022, and $1,634,144,485 in oil and gas production taxes and $1,502,726,167 in oil and gas extraction taxes in 2023.   And Montana collected approximately $110,677,519 in oil and gas taxes in FY2022.  The unlawful elevation of "conservation" as a "use" under FLPMA will substantially reduce both the royalties paid to mineral owners in Plaintiff States (including the States as a mineral owner) and the taxes paid to the States from those mineral royalties.

78.     The Final Rule will also injure Plaintiff States by removing from development lands and resources that are critical to Plaintiff States' economies and tax revenues.

79.     Livestock interests will be affected in Plaintiff States.  In Idaho, for example, BLM manages nearly twelve million acres of public lands (nearly one-quarter of the state's total land area) for multiple uses, including livestock grazing, and the State derives a substantial portion of its tax revenues directly or indirectly from these activities on BLM lands.  For instance, there are more than 2,100 BLM grazing allotments in Idaho, used by approximately 1,500 livestock operations, and grazing on BLM lands in Idaho generated $416 million in economic output in 2016.  Moreover, a large proportion of Idaho's State-owned endowment lands[2] are individual square-mile sections that are "landlocked" within BLM lands, and which can generally only be used for the same purposes as the surrounding BLM lands, such as livestock grazing or mining.  If

---

[2] Idaho received approximately 2.4 million acres of "endowment lands" when it was admitted as a state.  Idaho's endowment lands are held in trust and managed by the Idaho Department of Lands for the benefit of Idaho's public schools and certain other state institutions.

BLM unlawfully restricts the uses of the surrounding BLM lands, it will adversely affect the use of Idaho's endowment lands and reduce the State's endowment fund revenues.

80.     Mining interests will also be affected in Plaintiff States.  In Idaho, for example, mining on BLM lands—especially phosphate mining—is also crucial to the State economy.  The Western Phosphate Field—the largest remaining source of phosphate in the United States— includes southeast Idaho, and, pursuant to 30 U.S.C. § 191, Idaho receives a portion of the royalties received by the federal government for phosphate mining on BLM lands.  More than 5 million tons of phosphate ore was mined on federal lands in Idaho in 2023, generating revenues of over $5 million to Idaho and employing hundreds of residents with well-paying jobs.

81.     Plaintiff States also have quasi-sovereign interests in "ensuring that the State and its residents are not excluded from the benefits that are to flow from participation in the federal system."  *Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*, 458 U.S. 592, 607–08 (1982). This Final Rule was developed outside FLPMA's land-use planning procedures and implemented without meaningfully considering Plaintiff States' land use policies and programs, and without the meaningful involvement and participation by State and local officials that is required under FLPMA.  BLM's promulgation of the Final Rule without meaningfully coordinating with and considering the interests of Plaintiff States is an injury to Plaintiff States' quasi-sovereign interests.

82.     Furthermore, Plaintiff States are additionally injured by BLM's failure to comply with the requirements of NEPA in promulgating the Final Rule.  "'Injury under NEPA occurs when an agency fails to comply with the statute … The injury-in-fact is increased risk of environmental harm stemming from the agency's allegedly uninformed decision-making.'" *Missouri Coal. for Env't v. FERC*, 544 F.3d 955, 957 (8th Cir. 2008) (quoting *Sierra Club v. U.S. Army Corps of Eng'rs*, 446 F.3d 808, 816 (8th Cir. 2006)).

83. When a federal agency fails to adhere to the requirements of NEPA, "[t]he injury-in-fact is increased risk of environmental harm stemming from the agency's allegedly uninformed decision-making." *Sierra Club v. U.S. Army Corps of Engineers*, 446 F.3d 808, 816 (8th Cir. 2006) (*citing Comm. to Save the Rio Hondo v. Lucero*, 102 F.3d 445, 448–49 (10th Cir. 1996)).  The Final Rule's creation of restoration and conservation "leases" increases the risk of environmental harm in Plaintiff States by, among other things, allowing BLM to hand control of leased lands to individuals and entities that may refuse to coordinate with Plaintiff States regarding water supply, wildfire risk, and invasive species, thereby impairing the States. ability to manage those risks.  That increased risk of environmental harm causes concrete injury because Plaintiff States will "suffer the environmental consequences of [BLM's] action."  *Lucero*, 102 F.3d at 449.

## CLAIMS FOR RELIEF

### COUNT 1
### The Final Rule Violates the Federal Land Policy and Management Act
### (43 U.S.C. § 1701 *et seq.*)

84. Plaintiff States reassert and incorporate by reference all preceding paragraphs.

85. The Final Rule violates FLPMA in multiple respects.

86. Under FLPMA, the term "principal or major uses" includes, *and is limited to*, domestic livestock grazing, fish and wildlife development and utilization, mineral exploration production, rights-of-way, outdoor recreation, and timber production.  43 U.S.C. § 1702(l).  While the FLPMA requirements for "multiple use management" and "sustained yield" require BLM to control against the depletion of federal resources over time to ensure continued valuable uses in the future, *see* 43 U.S.C. §§ 1702(h), (c), the express focus of FLPMA is managing the "use" of those federal natural resources over time.

87. The Final Rule is inconsistent with FLPMA's multiple use management and sustained yield requirements. Rather than properly balancing present and future resource needs as

required by statute, the Final Rule attempts to transform the *non-use* of resources into a use of the resources by labelling it as a "conservation" use.  This elevation of "conservation" as a "use" under FLPMA's multiple use framework violates FLPMA, rendering the Final Rule unlawful.

88.     Courts should be skeptical when an agency "'claim[s] to discover in a long-extant statute an unheralded power' representing a 'transformative expansion in [its] regulatory authority'" over "'a significant portion of the American economy.'"  *West Virginia v. EPA*, 597 U.S. 697, 722, 724-25 (2022) (quoting *Utility Air Regulatory Group v. EPA,* 573 U.S. 302, 324 (2014)).  In such major questions, the agency must justify its action by "something more than a merely plausible textual basis for the agency action … [and] instead must point to 'clear congressional authorization' for the power it claims."  *Id*. at 723.  BLM's attempted elevation of non-use to be a "use" is perhaps the most fundamental change to federal land use and management since the enactment of FLPMA in 1976.  The Final Rule will have profound economic effects for much of the country—effects that will be felt most acutely in the Western half of the country—yet it is being ushered in without any material change in FLPMA's statutory text and without anything close to the "clear congressional authorization" required for such a change.

89.     Further, in accordance with the FLPMA, the development of federal and Indian mineral interests in Plaintiff States is governed by the Natural Resources Management Plans for the Plaintiff States, which are binding on BLM until they are amended though the public notice and comment process.  *Norton*, 542 U.S. at 69.  The Final Rule is inconsistent with Plaintiff States' Natural Resources Management Plans by, among other things, significantly expanding the federal lands and resources that will be precluded from development.  Because the Final Rule is inconsistent with Plaintiff States' existing RMPs, and those RMPs have not been formally

amended through notice and comment, that provides a second reason why the Final Rule is unlawful under FLPMA.

90.     Additionally, the Final Rule's creation of restoration and mitigation "leases" violates FLPMA's procedural requirements for withdrawing lands from development. Section 1714 of FLPMA places specific requirements on BLM before withdrawals can be made, including requiring that the Secretary publish notices of withdrawals in the Federal Register.  *See* 43 U.S.C. § 1714(b)(1); *see also* 43 U.S.C. § 1714(a) ("[T]he Secretary is authorized to make, modify, extend, or revoke withdrawals *but only in accordance with the provisions and limitations of this section*.") (emphasis added).  Because restoration and mitigation "leases" withdraw public lands from development, BLM's failure to comply with the procedural requirements of Section 1714 is another way in which the Final Rule violates FLPMA.

91.     Furthermore, in developing federal land use plans, FLPMA requires that BLM shall "coordinate" with the States, "assure that consideration is given" to the States' land-use plans, and "provide for meaningful public involvement of State and local government officials, both elected and appointed, in the development of land use programs, land use regulations, and land use decisions for public lands."  43 U.S.C. § 1712(c)(9).  BLM's failure to meaningfully coordinate with Plaintiff States and consider Plaintiff States' land-use plans in developing this Final Rule is yet another way in which its promulgation violated FLPMA.

## COUNT II
### The Final Rule Violates the Congressional Review Act
### (5 U.S.C. §§ 801-808)

92.     Plaintiff States reassert and incorporate by reference all preceding paragraphs.

93.     The Congressional Review Act provides that a rule formally rejected by both houses of Congress and the President "may not be reissued in substantially the same form, and a

new rule that is substantially the same as such a rule may not be issued, unless the reissued or new rule is specifically authorized by a law enacted after the date of the joint resolution disapproving the original rule."  5 U.S.C. § 801(b)(2).

94.     In both purpose and effect, this Final Rule is substantially the same as BLM's 2.0 Planning Rule that was rejected under the Congressional Review Act.  In order to restrict the development of public lands and natural resources, both rules adopt similar mitigation hierarchy processes, both emphasize the designation and protection of ACECs using substantially similar justifications, and both apply similar landscape-style management approaches.

95.     Because the Final Rule is "substantially the same" as BLM's 2.0 Planning Rule in both purpose and effect, it is unlawful under the Congressional Review Act.

**COUNT III:**
**The Final Rule Violates NEPA**
**(42 U.S.C. § 4321 *et seq*.)**

96.     Plaintiff States reassert and incorporate by reference all preceding paragraphs.

97.     Federal Defendants violated NEPA by failing to adequately assess the environmental impacts of the Final Rule before promulgating it.

98.     The Final Rule is a significant change in federal land use policy with the potential to "significantly affect the quality of the human environment."  *See* 42 U.S.C. § 4332(2)(C); *see also* 40 C.F.R. § 1508.1(q)(3).  Consequently, NEPA required BLM to take a "hard look" at the environmental impacts of the Final Rule and prepare either an Environmental Assessment or an Environmental Impact Statement.  42 U.S.C. § 4332(2)(C).

99.     BLM's application of the categorical exclusion violated NEPA.  An agency's invocation of the NEPA categorical exclusion is reviewed for arbitrary and capriciousness. *Friends of Richards-Gebaur Airport v. F.A.A.*, 251 F.3d 1178, 1187 (8th Cir. 2001). BLM's conclusory statement that the Final Rule was subject to a categorical exclusion because it "is

28

administrative or procedural in nature" and its effects "too speculative", 89 Fed. Reg. 40,333, is arbitrary and capricious.  Rules that implement a change to an existing framework—for example, by "revis[ing]" existing regulations—"qualify as 'substantive' action" and "meet the relatively low threshold to trigger some level of environmental analysis under [NEPA]." *California ex rel. Lockyer v. U.S. Dep't of Agriculture*, 575 F.3d 999, 1013-14 (9th Cir. 2009). Such is the case for this Final Rule, which "provides an overarching framework for multiple BLM programs." 89 Fed. Reg. at 40,308.

100.    Even assuming invocation of a categorical exclusion was proper, BLM's failure to explain why it determined there were no extraordinary circumstances requiring a NEPA review is independently a basis to invalidate the Final Rule.  There are twelve extraordinary circumstances requiring NEPA review even where a categorical exclusion applies, 43 C.F.R. § 46.215, and numerous commenters explained why many of those circumstances were present with the Final Rule.  Nonetheless, the totality of the Final Rule's analysis is "that none of the extraordinary circumstances identified at 43 CFR 46.215 applies to this rulemaking." 89 Fed. Reg. 40,333. BLM's failure to explain its conclusion, is an independent basis to invalidate the Final Rule under NEPA, as BLM has provided no basis to "ensure[] that the agency has … reasonably considered the relevant issues and reasonably explained the decision."  *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021).

101.    Moreover, assuming invocation of a categorical exclusion was proper and BLM's failure to explain the basis for its conclusion that there were no extraordinary circumstances was excusable, several extraordinary circumstances are clearly present for this Final Rule. For one, extraordinary circumstances exist if the Rule "[e]stablish[es] a precedent for future action or represent[s] a decision in principle about future actions with potentially significant environmental

effects." 43 C.F.R. §46.215(e).  That circumstance is evident on the face of the Final Rule.  *See* 89

Fed. Reg. at 40,308 (Final Rule "provides an overarching framework for multiple BLM programs

to facilitate ecosystem resilience on public lands").  For another, extraordinary circumstances

apply if a Rule has "highly controversial environmental effects." 43 C.F.R. §46.215(c).  That

circumstance is also present for this Final Rule, which received 216,403 comments (including from

many States[3]) and inspired multiple hearings in Congress—with the House passing legislation to

require withdrawal of the Rule.[4]  Courts have found agency actions with far fewer comments and

far less public debate to be "highly controversial" for NEPA review purposes.  *See, e.g.*, *Sierra*

*Club v. Bosworth*, 510 F.3d 1016, 1030-32 (9th Cir. 2007) ("Given the large number of comments,

close to 39,000, and the strong criticism from several affected Western state agencies, we cannot

summarily conclude that the effects of the [agency action] are not controversial.").

102.    Because BLM failed to adhere to the requirements of NEPA and prepare an

Environmental Impact Statement or Environmental Assessment taking a "hard look" at the

environmental impacts of the Final Rule, its promulgation was unlawful.

## COUNT IV:
### The Final Rule is Arbitrary and Capricious for Failing to Adequately Consider Costs and Plaintiff States' Reliance Interests
### (5 U.S.C. § 706)

103.    Plaintiff States reassert and incorporate all preceding paragraphs.

104.    The APA requires courts to hold unlawful and set aside agency actions that are

arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law (5 U.S.C.

---

[3] *E.g.*, **Attachment B**, Comments of North Dakota, BLM-2023-0001-153781 (Jul. 5, 2023);
**Attachment C**, Comments of Attorneys General from Idaho, Montana, North Dakota and six other
States, BLM-2023-0001-154008 (Jul. 5, 2023).

[4] *House Passes Bill that Would Block BLM's "Conservation Lease" Program*, Just the News
(Apr. 30, 2024) (discussing H.R. 1173, 118th Congress); *see also BLM's Final Rule Threatens*
*Western Way of Life*, House Committee on Natural Resources (Apr. 18, 2024).

§ 706(2)(A)), or that are in excess of statutory jurisdiction, authority, or limitation, or short of statutory right, *id.* § 706(2)(C). In addition to contravening BLM's authorities under multiple statutes, the Final Rule is unlawful and arbitrary and capricious for several reasons.

105.    For one, the Final Rule is arbitrary and capricious because BLM failed to conduct a quantification of the costs of the Final Rule in its Economic and Threshold Analysis.  Most specifically, the Final Rule failed to account for the likely and foreseeable decrease in mineral royalties due to the curtailment of current and future mineral production in response to the Final Rule's restrictions on mineral development, including the curtailment of state-owned and privately-owned minerals that are communitized with federal interests.  *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co*., 463 U.S. 29, 43 (1983) (agency rule arbitrary and capricious when the agency "entirely failed to consider an important aspect of the problem"); *Red River Valley Sugarbeet Growers Ass'n v. Regan*, 85 F.4th 881, 886–87 (8th Cir. 2023) (same).

106.    For another, the Final Rule is arbitrary and capricious because it fails to consider the significant reliance interests Plaintiff States have invested in BLM continuing to develop mineral interests, most specifically communitized mineral interests, as it has done for decades. Plaintiff States' revenues and economies are significantly reliant upon the statutory directions for using public lands under FLPMA and the MLA, and the Final Rule reflects no meaningful consideration of those significant reliance interests before fundamentally changing how federal lands and mineral interests will be used and developed in Plaintiff States.  Federal Defendants' failure to meaningfully consider the Final Rule's adverse effects on Plaintiff States' long-held reliance interests renders the Final Rule arbitrary and capricious.  *DHS v. Regents of the Univ. of Calif.*, 591 U.S. 1, 30 (2020) ("When an agency changes course … it must 'be cognizant that

longstanding policies may have engendered serious reliance interests that must be taken into account.'") (cleaned up) (citation omitted).

## COUNT V
### The Final Rule Violates the Mineral Leasing Act
### (30 U.S.C. § 180 *et seq.*)

107.    Plaintiff States reassert and incorporate all preceding paragraphs.

108.    The MLA recognizes that the States retain their sovereign right to manage lands and mineral resources, stating that that "[n]othing in this chapter shall be construed or held to affect the rights of the States or other local authority to exercise any rights which they may have." 30 U.S.C. § 189; *see also* 30 U.S.C. § 187 (stating no leases issued by the Secretary of the Interior "shall be in conflict with the laws of the State in which the leased property is situated").

109.    BLM's authority to enter into and modify communitization agreements affecting State and private mineral interests is limited and requires the "consent of the holders of leases involved." 30 U.S.C. § 226(m). The Final Rule's provisions allowing for the creation of mitigation and restoration leases on federal lands that are subject to communitization agreements constitute an unlawful modification of those communitization agreements, impairing Plaintiff States' management of those communitized State and private mineral interests.

110.    Because the Final Rule impairs Plaintiff States' sovereign authority over the development of the State and private mineral interests, the Final Rule exceeds BLM's statutory authority under the MLA.

### PRAYER FOR RELIEF AND DEMAND FOR JUDGMENT

111.    WHEREFORE the Plaintiff States respectfully requests that this Court:

a. Issue a Declaratory Judgment that the Final Rule is unlawful;

b. Vacate the Final Rule;

c.  Enter other preliminary or permanent injunctive relief as Plaintiff States may hereafter specifically seek; and

d.  Grant such additional relief as the Court deems just and proper to remedy the Defendants' violations of law and to protect Plaintiff States' sovereign interests.

Dated: June 21, 2024

DREW H. WRIGLEY
Attorney General

/s/ *Paul M. Seby*
PAUL M. SEBY
Special Assistant Attorney General
1144 15th St, Suite 3300
Denver, CO 80202
Phone: (303) 572-6584
Email: sebyp@gtlaw.com

PHILIP AXT
Solicitor General
600 E. Boulevard Ave., Dept. 125
Bismarck ND 58505
Phone: (701) 328-2595
Email: pjaxt@nd.gov

*Counsel for State of North Dakota*

RAÚL R. LABRADOR
Attorney General

*/s/ Michael C. Orr*
JOY M. VEGA
MICHAEL C. ORR
Deputy Attorneys General
Energy and Natural Resources Division
JOSHUA N. TURNER
Chief of Constitutional Litigation and Policy
Office of the Attorney General
700 W. State Street, 2nd Floor
P.O. Box 83720
Boise, ID 83720
Phone: (208) 334-2400
Email: joy.vega@ag.idaho.gov
Email: michael.orr@ag.idaho.gov
Email: josh.turner@ag.idaho.gov

*Counsel for State of Idaho*

AUSTIN KNUDSEN
Attorney General

*/s/ Christian B. Corrigan*
CHRISTIAN B. CORRIGAN
Solicitor General
PETER M. TORTENSEN, JR.
Deputy Solicitor General
Montana Department of Justice
215 N. Sanders Street
Helena, MT 59601
Phone: (406) 444-2707
Email: Christian.Corrigan@mt.gov
Email: Peter.Torstensen@mt.gov

*Counsel for State of Montana*